UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

RAYNALDO RAMOS                                                                    PLAINTIFF

V.                                                             CIVIL ACTION NO. 3:23-CV-235-DPJ-ASH

HARTFORD ACCIDENT AND INDEMNITY
COMPANY, TWIN CITY FIRE INSURANCE
COMPANY, and CARY HICKMAN                                               DEFENDANTS

ORDER

After a collision in February 2021, Raynaldo Ramos sued the other driver as well as two

insurance companies, alleging bad faith because the insurers had paid nothing under the

applicable uninsured-motorist (UM) policies.  The insurers moved for summary judgment [55],

which the Court denied [79].  Discovery now having closed, the insurers again move [176] for

summary judgment based largely on the same arguments they raised before.  The motion is

denied.

I.       Background

As Rule 56 requires, these background facts are offered in the light most favorable to

Ramos.  Driving back from a work assignment, Ramos was rammed by an SUV driven by an

intoxicated driver who ran a red light.  Ramos suffered serious physical injuries including severe

brain damage.  Stingley Dep. [58-2]; Katz Dec. [211-5].  The offending driver, Defendant Cary

Hickman, was uninsured, so Ramos submitted a claim on the Hartford UM policies held by his

employer.[1]  Urankar Dep. [211-6] at 62:5–18.  While Hartford's arguments in this motion focus

---

[1] The employer held two policies issued by two insurance companies, but this Court follows
Defendants' usage in referring to them as "Hartford," singular.  *See* Urankar Dep. [211-6] at 6:5–
11 (explaining both Defendants "fall under The Hartford Insurance Group umbrella . . . .  These
are writing companies that are admitted in various states across the country to issue insurance
policies").

1

on economic damages, *see* Defs.' Mem. [195] at 1, the policies also covered pain and suffering. Urankar Dep. [211-6] at 111:11–15.

In March 2021, Ramos's counsel made a policy-limits demand on the two applicable policies; the limits totaled $6 million. 2021 Ltr. [178] at 43. To support that demand, she attached the police report (which included pictures showing the devastating damage to Ramos's van) and Hickman's citations for driving while intoxicated and without liability insurance. *Id.* The letter asserted that Ramos incurred traumatic brain damage and fifteen other physical injuries. *Id.* Hartford responded by requesting relevant medical records and bills. Bielinski Dep. [211-7] at 82:16–83:9.

After Hartford assigned the case to its claims consultant Brent Bielinski, Ramos's counsel began providing medical documentation. *Id.* at 86:9–88:25. Because Ramos had also filed for workers' compensation, at least part of his medical expenses and lost pay were covered by that policy. Urankar Dep. [211-6] at 80:13–81:9.

In October 2021, upon receipt of another batch of medical records, Bielinski said he'd prefer Ramos's counsel to "wait until the treatment is complete and send them as one total package." Email [211-9]. Counsel responded that Ramos's "traumatic brain and cervical spine injury that will impact him for the rest of his life" meant there was no anticipated date to complete treatment. Pearlman Aff. [66] ¶ 27. Bielinski suggested slowing down on the records anyway, "understand[ing] that [Ramos] has severe injuries as a result of this loss and the treatment will be extensive." *Id.* ¶ 28.

The primary dispute here is whether Hartford had a duty to pay Ramos some portion of his losses before it tendered its policy limits almost three years later in June 2024. Along those

lines, Bielinski was asked in his deposition whether Ramos had established "at least a hundred

thousand dollars" in losses by November 2021:

> Q: In other words, if Mr. Ramos had requested a tender of some of the money
> from the UM proceeds for what he had already been through, in your mind, he
> had made a satisfactory showing and proven that he was entitled to some of it?
>
> A: Yeah, I think the case could be evaluated, or reviewed and evaluated based on
> that request.
>
> Q: Just based on what you knew as it existed on November 10th, 2021, do you
> believe a reasonable amount to tender to Mr. Ramos for all of the things he had
> been through in the preceding nine months, would have been at least a hundred
> thousand dollars?
>
> A: Reasonably, yes.
>
> Q. Likely more.  Maybe a hundred thousand at a minimum?
>
> A. Yeah, I hadn't done a complete evaluation at that point.  If any, I was still
> waiting on the medicals, based on what we're looking at, it's a significant injury.

Bielinski Dep. [211-7] at 114:3–115:3.

But Bielinski thought Hartford had no duty to advance any funds, based on his own

internet searches about the law.  *Id*. at 153:9–154:19.  He thought this despite having consulted

an in-house "State Content Map" for Louisiana that noted the need to tender partial "payment as

advance on settlement within 30 days of satisfactory proof of loss" (a "*McDill* tender,"[2] of which

more below).  Content Map [211-4]; Bielinski Dep. [211-7] at 148:17–23.

Despite Hartford's knowledge in November 2021 that Ramos had suffered serious

injuries, Bielinski's supervisor, Ryan McKain, testified that Ramos had not at that point

sufficiently proved *any* compensable pain and suffering:

> Q: When you received—and I'm sticking with early November 2021.  When you
> received this case file and the onslaught of medical records and read about Mr.

---

[2] *McDill v. Utica Mut. Ins. Co.*, 475 So. 2d 1085 (La. 1985).

Ramos's experience after this crash, **did you believe that Mr. Ramos had made a satisfactory proof of loss for pain and suffering damages in excess of $0?**

A: **No**.

Q: Mr. McKain, **how is that possible?**

A: . . . The—the claim under the UM policy is that pain and suffering—general damages, what we call general damages, right. That's—**there's no way to make a determination as to what those are. Are they more than zero? Perhaps. Could they have been zero? Absolutely.**

I mean, he could have been one of those guys that make a fantastic, remarkable recovery. . . .

. . . .

Q: Was it your assessment in early November 2021 that based upon the evidence that you reviewed and the claims file notes that you had available to you that from February 21st until the time of your assessment in that nine-month period that Mr. Ramos had potentially sustained $0 in general damages or pain and suffering damages?

A: Yeah, I wouldn't—wouldn't say that. **I would say I was unable to make a determination as to what his claim was worth.**

McKain Dep. [180] 117:13–120:1 (boldfacing added; references to counsel omitted).

In contrast, Hartford's corporate representative, Daniel Urankar, testified that Ramos "almost certainly" incurred noneconomic damages as of November 2021, but he said Hartford did not make a tender because it didn't yet know "what the ultimate proof of loss was going to show us." Urankar Dep. [211-6] at 98:24–99:2. He also testified that by November 2021, Hartford did not question liability or coverage in Ramos's case. *Id*. at 107:17–19.

Another Hartford employee, Michelle Holiday-Crandall, said that by October 30, 2023, she understood that Ramos had experienced pain and suffering, but no tender was made over the next 30 days. Holiday-Crandall Dep. [211-1] at 91:2–20. In fact, no partial tender was ever made.

Two months after Hartford admittedly knew Hickman was at fault and coverage existed, Ramos's counsel sent another demand letter.  The January 2022 letter again demanded policy limits and attached a seven-page summary of Ramos's past and projected treatment, including the facts that he was in pain from his injuries and that his impairment caused him loss of enjoyment of life.  2022 Ltr. [178] at 30.  In February 2023, having never received any counteroffer or tender from Hartford in the two years since his collision, Ramos sued.

The information flow regarding Ramos's damages continued in his initial disclosures and discovery responses.  For instance, he says that on February 2, 2024, he provided "itemized invoices showing a total of $267,000.00 in bills for NRC TASS [Post-Acute Brain Injury Rehabilitation Program] alone that were not paid by workers' compensation."  Kirkhart Aff. [63-1] at 4.  Hartford does not dispute that Ramos made these disclosures, but it says Ramos should have itemized the TASS treatment and highlighted those damages if he expected payment.  Defs.' Reply [221] at 2.  Hartford ultimately says it could not determine the full extent of injuries—and therefore had no duty to pay anything—until it received Ramos's life-care plan.  Defs.' Mem. [195] at 20–21.

That happened April 26, 2024, after Ramos received several extensions to designate the expert who prepared the report.  *Id*.; *see* Brawner Dec. [211-32], [211-33].  This document estimated a "Grand Total Lifetime Cost" for Ramos's care at somewhere from $8.7 million to $14.6 million.  Brawner Dec. [211-33] at 30.  After various reviews, Hartford then paid the $6 million policy limits on June 17–18, 2024.  Urankar Dec. [193] ¶¶ 12–13.

II.    Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute about any material fact and the moving party is entitled to

judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case[ ] and on which that party will

bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion[ ] and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.  The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence,

factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both

parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make

credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in favor

of the nonmovant."  *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v.*

*Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated

assertions, and legalistic arguments have never constituted an adequate substitute for specific

facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754,

759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37

F.3d at 1075.

III.    Discussion

As in its previous summary-judgment motion, Hartford continues to claim that Ramos's

damages under its policy "remained uncertain up until the time he submitted his life[-]care plan

6

to Hartford" on April 26, 2024.  Defs.' Mem. [195] at 16.  It adds three other arguments, all of

which build from that premise:  judicial estoppel, prompt review of the life-care plan once

received, and the inapplicability of one bad-faith statute to UM claims.  *Id*. at 12, 17, 22.  Before

addressing those arguments, the Court reviews the relevant Louisiana law.

The bad-faith claims Hartford wants dismissed are based on two Louisiana statutes as

they stood in February 2021 when the collision occurred.  Section 22:1973 penalizes "failing to

pay the amount of any claim due any person insured by the contract within sixty days after

receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious,

or without probable cause."  La. R.S. § 22:1973(B)–(C) (2021) (formerly § 22:1220; current

version § 22:1821).  It imposes on top of any consequential damages sustained "an amount not to

exceed two times the damages caused or five thousand dollars, whichever is greater."  *Id.*  This

penalty rests on the insurer's breach of the duty of good faith and fair dealing, not of the

insurance contract itself.  *Durio v. Horace Mann Ins. Co.*, 74 So. 3d 1159, 1170 (La. 2011).

The other statute—section 22:1892—provides penalties, including attorney fees, for the

"failure to make payment within thirty days after receipt of such satisfactory written proofs and

demand therefor . . . when the failure is found to be arbitrary, capricious, or without probable

cause."  La. R.S. § 22:1892(B)(1) (2021).  When proved, the insurer faces "a penalty, in addition

to the amount of the loss, of fifty percent damages on the amount found to be due from the

insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured."  *Id.*

Notably, the statute also addresses partial payments by insurers, stating that if "a partial payment

or tender has been made," the penalty is "fifty percent of the difference between the amount paid

or tendered and the amount found to be due as well as reasonable attorney fees and costs."  *Id.*

Unlike section 22:1973, section 22:1892(B)(1) penalizes breach of the insurance contract rather than the duty of good faith. *Durio*, 74 So. 3d at 1170.

The two statutes prohibit "virtually identical" conduct, "i.e., failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious or without probable cause*." Calogero v. Safeway Ins. Co. of La.*, 753 So. 2d 170, 174 (La. 2000) (noting "primary difference" is 30- vs. 60-day period in which insurer must pay). Also, the award of attorney fees is mandatory under section 22:1892 but discretionary under section 22:1973. *Id.*

One cannot recover bad-faith damages under both statutes—the statute with the greater penalty controls—but one may collect bad-faith damages under section 22:1973 as well as attorney fees under section 22:1892. *Id.* Another difference, which will be explored below, is that section 22:1973 requires only "satisfactory proof of loss" while section 22:1892 specifies that the insured must also make a demand on the insurer.

"'Arbitrary and capricious' has virtually the same meaning" in both statutes: "vexatious," "unjustified, without reasonable or probable cause or excuse." *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 297 (5th Cir. 2009) (quoting *Calogero*, 753 So. 2d at 174). While the burden is on a plaintiff to show vexatious conduct, once he provides facts in support, "the burden of persuasion shifts to the insurer to rebut the insured's showing." *Id.* at 298.

"Satisfactory proof of loss" under Louisiana law "is that which is sufficient to fully apprise the insurer of the insured's claim." *Hart v. Allstate Ins. Co.*, 437 So. 2d 823, 828 (La. 1983) (citing predecessor statute to section 22:1892). An insurer receives "satisfactory proof of loss" when it receives "sufficient facts which fully apprise the insurer" (1) "that the owner or operator of the other vehicle involved in the accident was uninsured or underinsured"; (2) "he

was at fault"; (3) "such fault gave rise to damages"; and (4) "the extent of those damages." *Id.*

These are known as the *Hart* factors.

In cases like this one when the first three *Hart* factors are not disputed, the insurer may

have a duty to make a partial tender before the full extent of damages is known. The Louisiana

Supreme Court explained this duty in *McDill*:

> If the insured has shown that he was not at fault, the other driver was
> uninsured/underinsured and that he was in fact damaged, **the insurer cannot
> stonewall the insured because the insured is unable to prove the *exact* extent
> of his general damages.** General damages by their very nature are subjective and
> incapable of exact computation. To accept the defendant's position that no
> amount must be tendered unless the exact extent of general damages is proven
> renders the 4th element of the *Hart* test meaningless as it places an impossible
> burden on the plaintiff prior to going to trial. **If the first three elements of the
> *Hart* test are satisfied and the insured has made a showing that the insurer
> will be liable for <u>some</u> general damages, the insurer must tender the
> reasonable amount which is due.** This amount would be **unconditionally
> tendered** to the plaintiff not in settlement of the case, but to show their good faith
> in the matter and to comply with the duties imposed upon them under their
> contract of insurance with the insured. The amount that is due would be a figure
> over which reasonable minds could not differ.

475 So. 2d at 1091–92 (boldfacing and underlining added). "Any insurer who fails to pay said

undisputed amount has acted in a manner that is, by definition, arbitrary, capricious or without

probable cause." *La. Bag Co. v. Audubon Indem. Co.*, 999 So. 2d 1104, 1116 (La. 2008).

Hartford ignores *McDill* tenders in its opening memorandum, but in reply it says there

was never a duty to make such a tender because Ramos never requested one and never made a

"demand for a specific amount" that should be paid under *McDill*. Defs.' Reply [221] at 3; *see

also id.* at 12. But Hartford offers no legal authority suggesting that an insured must make a

formal demand for a *McDill* tender apart from the insured's demand on the claim.

And *McDill* itself rejects the suggestion that Ramos was required to make a *McDill*

demand in a specific dollar amount, especially as to general damages. *McDill* notes that general

damages, like pain and suffering, "by their very nature are subjective and incapable of exact computation." 475 So. 2d at 1091. Despite that, there can be general damages in amounts over "which reasonable minds could not differ." *Id.* Like Hartford, the insurer in *McDill* (Utica) complained that the insured had not provided all records necessary to assess the exact loss. 475 So. 2d at 1092. While the court acknowledged that Utica would have been in a better position to adjust the claim had it possessed that proof, it saw no excuse:

> [W]here plaintiff's medical bills all but deleted the $10,000 primary coverage, Utica had to have been fully apprised that they had some liability to McDill as their insured. In this case, had Utica tendered some reasonable amount of the general damages, they would not have been arbitrary and capricious and the penalty provision would not apply.

*Id.* Hartford has offered no authority undermining *McDill*, so the Court now addresses Hartford's arguments under that binding precedent.

A.    Ramos Is Not Judicially Estopped

"[T]he Supreme Court of the United States has generally described judicial estoppel as an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Miller v. Conagra, Inc.*, 991 So. 2d 445, 452 (La. 2008) (citing *New Hampshire v. Maine,* 532 U.S. 742, 749–50 (2001)).

Hartford argues that Ramos is judicially estopped from claiming it should have made an earlier tender because he asked for more time to submit his expert's report containing the life-care plan. Defs.' Mem. [195] at 12. Hartford asks how it could be expected to pay the claim when Ramos "was unable to quantify his damages or demand that Hartford pay for any undisputed medical treatment or other expenses allegedly covered by the UM policy before he produced his life[-]care plan." *Id.*

This argument fails for the same reason the Court denied Hartford's first summary-judgment motion—there is a fact question whether Hartford was required to make at least a partial tender under *McDill*. 475 So. 2d at 1091 ("[T]he insurer cannot stonewall the insured because the insured is unable to prove the *exact* extent of his general damages."); *see also* Order [79] at 5–6 (denying summary judgment).

Based on *McDill*, the extension Ramos received to calculate the exact extent of his future economic losses does not estop him from claiming that Hartford should have already paid him an amount on which "reasonable minds could not differ." *Id.* at 1092. And that would include more than just the "medical treatment and other expenses" Hartford focuses on. Defs.' Mem. [195] at 12. General damages—which *McDill* addresses—include noneconomic damages like pain and suffering. *Green v. K-Mart Corp.*, 874 So. 2d 838, 844 (La. 2004). Ramos is not estopped from asserting a *McDill* claim.

B.      Satisfactory Proof of Loss Is a Jury Question

Hartford again argues that—as a matter of law—Ramos failed to provide satisfactory proof of loss. Hartford acknowledges that the "seriousness of Mr. Ramos's accident was well known[] and is undisputed." Defs.' Mem. [195] at 16. Yet it believes Ramos was required to provide the exact amount of all past, present, and future losses before anything was due. It says that didn't happen until the life-care plan—"the first and only arguable specific and concrete articulation of the impact of his injuries." *Id.* at 17.

There are two problems with this argument. First, as already stated, Ramos was not required to provide "specific and concrete" proof of the full extent of his losses to trigger Hartford's duty to make at least a partial tender. *McDill*, 475 So. 2d at 1091 (rejecting argument that plaintiff must prove "exact" extent of loss before a tender is due). Second, when the record

11

is viewed in the light most favorable to Ramos, a fact question exists whether Ramos provided

sufficient proof of both economic *and* noneconomic losses long before Hartford tendered its

limits.  *See, e.g.*, Bielinski Dep. [211-7] at 114:3–21 (testifying there was a reasonable amount

that could have been tendered in November 2021); *see also* Urankar Dep. [211-6] at 98:24–99:2

(testifying that Ramos "almost certainly" incurred noneconomic damages as of November 2021).

This issue cannot be decided as a matter of law.

> C.       A Jury Question Exists Whether Hartford's Review Was Reasonable

Ramos says Hartford violated section 22:1892's 30-day time limit because, even

assuming the life-care plan was the first sufficient proof of loss, Hartford still waited 52 days to

tender its limits.  Hartford responds that it didn't violate section 22:1892 because it "conducted a

reasonable and timely review" before making a tender 52 days after receiving the plan.  Defs.'

Mem. [195] at 18.  This is a distinct legal theory from Ramos's other claim that Hartford failed

to make a *McDill* tender long before receiving the life-care plan.  And as with that other theory,

Ramos creates a question of fact.

Hartford constructs its argument from the same foundation as its other arguments,

insisting that Ramos failed his duty to prove the exact extent of his past and future economic

damages.  *Id.  McDill* forecloses that legal contention.  Otherwise, Hartford says it acted

reasonably after receiving the plan, though it made no tender before paying policy limits more

than 30-days after receipt.

The failure to make a *McDill* tender distinguishes the cases Hartford relies on for this

argument.  It first cites the Fifth Circuit's holding in *First United Pentecostal Church v. Church

Mutual Insurance Co.*, 119 F.4th 417 (5th Cir. 2024).  In that case, the parties disputed a

property loss.  The Fifth Circuit concluded, as a matter of law, that the insurer did not act

arbitrarily or capriciously in failing to pay the claim within 30 days because there were

"reasonable and legitimate questions as to the extent and causation of a claim." *Id.* at 428.  But

unlike Hartford, that insurer made a partial tender for the amounts that were not reasonably

disputed, $166,090.81.  *Id*. at 422.  Beyond that amount, the parties disputed not only the extent

of the damages but also causation.  *Id.* at 428.  And they disputed economic losses and not

general damages like pain and suffering, which are by their nature difficult to quantify yet create

a duty to make a tender when there are losses for which "reasonable minds could not differ."

*McDill*, 475 So. 2d at 1092.  Hartford never disputed causation, but it made no initial tender, not

even for pain and suffering.

      The same thing happened in Hartford's other main case, *Freeman v. Ocean Harbor*

*Casualty Insurance Co.*, No. 22-5546, 2025 WL 963132 (E.D. La. Mar. 28, 2025).  Freeman

addressed a homeowner's property-loss claim following a hurricane.  Unlike Hartford, the

insurer paid an initial amount for some losses, but the parties disputed whether the hurricane

caused other losses.  *Id.* at 3.  Perhaps because the insurer made a partial tender, the plaintiff

never addressed *McDill* in her summary-judgment briefs, and the district court never addressed

it.  And like in *First United Pentecostal Church*, the dispute in *Freeman* was over economic

losses.

      The Court could stop here, but it will briefly comment on the parties' factual arguments

about Hartford's actions after receiving the life-care plan.  The parties volley over what Hartford

did or didn't do during the 30 days after it received the plan.  But that does not resolve the

*McDill* issue if the jury finds satisfactory proof of at least some loss—not an exact total

amount—before the 30-day window expired.  In other words, assuming Ramos fails to show a

duty to make a *McDill* tender before the life-care plan arrived, there is still a fact question

whether the additional information received with the plan triggered the duty to make some tender within 30 days.

These are "essentially . . . factual issue[s]." *First United Pentecostal Church*, 119 F.4th at 427. So the Court may not weigh the evidence under Rule 56. And on this record, it cannot say—as a matter of law—whether Hartford acted arbitrarily and capriciously after receiving the plan. *See Sacks v. Allstate Prop. & Cas. Ins. Co.*, No. CV16-16578, 2017 WL 4791179, at *3–4 (E.D. La. Oct. 24, 2017) (denying summary judgment on bad faith where issues of facts and reasonableness better suited to jury).

D.      Which Bad-Faith Statute Applies

Hartford's fourth and final argument questions which bad-faith statute applies to its deadline after receiving the life-care plan, section 22:1892 or section 22:1973. *Id.* To recap, section 22:1892 requires payment within 30 days after a demand, whereas section 22:1973, as it existed in February 2021, allowed 60 days to pay if there was no demand but the insured provided notice and proof of a claim. *See* La. R.S. § 22:1973(B)(5) (2021) (current version § 22:1821). Both allowed penalties for failing to meet the deadlines.

This matters to Hartford because, as discussed in the last section, Ramos argues that even assuming no satisfactory proof of loss before the life-care plan, Hartford violated section 22:1892 by not paying within 30 days of receiving the plan. But Hartford says the life-care plan did not trigger section 22:1892 because Ramos produced it as part of discovery and did not present the plan as a demand. Defs.' Mem. [195] at 23. In other words, "[b]ecause no demand accompanied the expert disclosure [which included the plan], the 30[-]day requirement of 1892 does not apply," and Hartford satisfied section 22:1973's 60-day deadline. *Id.*

14

But Hartford's analysis relies on a single case stating that demands must be for a specific amount. Defs.' Reply [221] at 12 (quoting *Smith v. La. Farm Bureau Cas. Ins.*, 603 So. 2d 199, 205 (La. Ct. App. 1992)). The Court addressed *Smith* at length when it denied Hartford's first summary-judgment motion and incorporates that analysis here. *See* Order [79] at 7–8. The Court found *Smith* lacking and held that "[w]ithout better authority, the Court finds at least a question of fact whether a demand occurred." *Id.* at 8. Hartford again relies on *Smith* and has not addressed the Court's concerns.

Another intermediate Louisiana court has concluded that "[w]hat constitutes demand . . . is to be determined in the light of the facts and circumstances of each individual case." *Wilkins v. Allstate Ins. Co.*, 173 So. 2d 199, 202 (La. Ct. App. 1965). And, yet another court stated that no further demand need be made if there was a previous demand or "where the proof of loss alone could . . . be construed as a demand in itself." *Steadman v. Pearl Assur. Co.*, 167 So. 2d 527, 530 (La. Ct. App. 1964) (holding bad faith shown where payment made one day after deadline).

Had Ramos already made a demand? Did Ramos's counsel's January 2022 letter asking for the policy limits constitute a "demand"? Did giving the plan to Hartford in April 2024 complete the January 2022 demand Hartford dismissed because it lacked a life-care plan? Did the life-care plan constitute a new demand? Hartford offers no legal authority finding—as a matter of law—that facts like these fail to constitute a demand. These too are questions for the jury, not to be resolved on summary judgment given this record.

IV.    Conclusion

The Court has considered all arguments presented.  Any not specifically addressed here would not alter the outcome.  Defendants' second motion for summary judgment [176] is denied.

**SO ORDERED AND ADJUDGED** this the 11th day of June, 2025.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE