UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

RAYNALDO RAMOS                                                    PLAINTIFF

V.                                    CIVIL ACTION NO. 3:23-CV-235-DPJ-ASH

HARTFORD ACCIDENT AND                                         DEFENDANTS
INDEMNITY CO., et al.

ORDER

Plaintiff Raynaldo Ramos and the Defendant insurance companies (collectively

"Hartford") filed eight motions in limine.  The Court ruled on most of those in Order [274], one

sub-issue to Motion [240] was deferred.  This Order addresses the balance:

- Hartford's Motion [237] About Evidence Unrelated to Bad Faith and Motion
  [262] to Exclude Specific Consequential Damages

- Plaintiff's Motion to Exclude and/or Limit Evidence and Argument Contrary to
  Applicable Louisiana Law Regarding Insurer Bad Faith and Workers'
  Compensation [240]; and

- Plaintiff's Motion to Exclude and/or Limit Evidence and Argument Contrary to
  Applicable Law Regarding Medical Testimony, Medical Causation and Damages
  [242].

I.      Standard

As summarized by the Fifth Circuit:

> A motion in limine is a motion made prior to trial for the purpose of
> prohibiting opposing counsel from mentioning the existence of, alluding to, or
> offering evidence on matters so highly prejudicial to the moving party that a
> timely motion to strike or an instruction by the court to the jury to disregard the
> offending matter cannot overcome its prejudicial influence on the jurors' minds.

*O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 n.1 (5th Cir. 1977) (citation and quotation

omitted).

"[G]enerally, doubts should be resolved in favor of admissibility."  *United States v. Cent.*

*Gulf Lines, Inc.*, 974 F.2d 621, 625 (5th Cir. 1992).  And "a motion in limine cannot be a

substitute for a motion for summary judgment, a motion to dismiss, or a motion for directed verdict." *Id*. at *6 (quoting *Morgan v. Mississippi,* No. 2:07-CV-15-MTP, 2009 WL 3259233, at *1 (S.D. Miss. Oct. 8, 2009)); *see also* 21 *Federal Practice and Procedure* § 5037.18 (stating "the preexisting caselaw provides ammunition against those who would use the motion in limine as a substitute for a motion for summary judgment or other peremptory ruling in civil cases").

Finally, as with all in limine orders, the non-prevailing party may revisit the issue at trial outside the jury's presence. *Jackson-Hall v. Moss Point Sch. Dist.*, No. 3:11-CV-42-DPJ-FKB, 2012 WL 1098524, at *4 (S.D. Miss. Apr. 2, 2012).

II.    Discussion

The Court entered two orders denying summary-judgment motions. *See* Orders [260, 79]. Those Orders discuss the factual and procedural history and consider the legal framework for Ramos's claims. They are incorporated. While the Court will mention these issues, it will not take another deep dive into them.

    A.    Hartford's Motion [237] About Evidence Unrelated to Bad Faith and Motion [262] to Exclude Specific Consequential Damages

In the first motion [237] Hartford asked "for an order precluding the Plaintiff from introducing any evidence, testimony, or argument not pertaining to the alleged breach of Louisiana bad faith statutes La. R.S. §§ 22:1892 and 1973." Mot. [237] at 1. That motion addressed two categories of evidence—evidence related to the claims against Cary Hickman (the uninsured motorist) and evidence of consequential damages. The second motion [262] sought to exclude evidence or argument that Hartford's alleged bad faith caused consequential damages related to Ramos's inability to live with his family and receive in-home care.

2

### 1.    Evidence Regarding Hickman's Fault

Starting with evidence about Hickman, the Court bifurcated the claims against that defendant. As a result, evidence related solely to Hickman's fault would cause undue prejudice and confusion while wasting time. These concerns substantially outweigh whatever limited probative value may exist. The motion is therefore granted to that extent.

That said, there is overlap between the bad-faith claim and the personal-injury claims against Hickman—what Hartford knew about the accident and when are relevant to whether it should have paid sooner. Thus, information Hartford knew about Hickman's fault before Hartford tendered its limits will not be excluded in limine. If Hartford believes Ramos has exceeded this scope at trial, it may make a timely objection.

### 2.    Consequential Damages

Hartford wants to prevent Ramos from submitting proof of consequential damages, saying he hasn't provided proof of any damages caused by its alleged breach of the bad-faith statutes, as opposed to penalties imposed by those statutes. *See* Defs.' Mem. [238]. The second motion [262] gives an example, stating that Hartford only recently learned that Ramos would attempt to prove Hartford's alleged breach prevented him from receiving in-home care that would have mitigated future medical expenses and other damages. These motions overlap; the Court begins with the first.

***Motion [237].*** To start, Hartford acknowledges that consequential damages are part of the available remedies under section 22:1973. *Id.* at 8 (citing *Dudenhefer v. La. Citizens Prop. Ins. Corp.*, 280 So. 3d 771, 778 (La. Ct. App. 2019)). In *Dudenhefer*, the court noted that penalties under section 22:1973 are not calculated by the "contractual damages due or awarded under the insurance contract" but are computed "by doubling the amount of damages attributable

to the insurer's breach of duties imposed under the statute." 280 So. 3d at 778 (quoting *Durio v. Horace Mann Ins. Co.*, 74 So. 3d 1159, 1171 (La. 2011)). The "damages attributable to the insurer's breach" include "consequential damages." *Durio*, 74 So. 3d at 1169, 1170.

Though consequential damages are relevant, Hartford generally argues that Ramos neither disclosed any facts supporting consequential damages in discovery nor proved them. Defs.' Mem. [238] at 8. Starting with disclosures, Hartford says its Interrogatory No. 7 asked Ramos to state "each and every factual detail or basis which you claim supports such allegations." *Id.* at 2. It then argues that "Plaintiff did not identify/itemize in its response to Hartford's above interrogatory (*or any other response to discovery*) any damages stemming specifically from Hartford's handling of the claims adjusting process or any specific valuation of his bad faith damages or at any other time in discovery." *Id.* at 5 (emphasis added).

Looking first to the argument that Ramos failed to identify the factual basis for consequential damages, Hartford relies on Ramos's response to its first set of interrogatories. *See, e.g.*, *id.* at 4–5, 10. True, Ramos generically responded to Hartford's Interrogatory No. 7 without providing a factual basis. *Id.* at 4.

But Hartford fails to address Ramos's responses to its second set of interrogatories. In that set, Interrogatory No. 7 asked Ramos to

> identify with specificity all damages you claim in this case, the factual basis for the damage claim, how that amount is calculated and the identity of the underlying documents to support the damage claim. This should include the date of any medical expenses that were submitted to the defendants that were unpaid that you claim form the basis for any penalty or bad faith damages in this action.

Pl.'s Resp. to 2d Int. No. 7 [251-1] at 60. To this, Ramos stated:

> The factual basis for Ray's bad faith damages claim is as follows. Ray has suffered real and appreciable damages due to Defendants' failure to pay what he is owed as a first-party claimant under these insurance policies. ***Ray's inability to afford in-home care attendants to supervise his activities left Ray in what his***

4

*treating physician describes as "a dire situation."*  This was stated by Dr. Howard Katz in his report dated December 19, 2023, on pages 3-4.  Because Ray was left unsupervised while exhibiting the hypersexual symptoms of his injuries, Ray is subject to a stay-away order that prevents him from living at home with his family and being cared for in the home by his family.  *In addition to general damages, Ray has suffered economic damages representing the increased cost of his care in an institution as opposed to in-home care with attendants as originally prescribed by his treating physician.*

*Id.* at 61 (emphasis added).  And this:

Ray required in-home care attendants due to the injuries he sustained in the crash.  As a result of the February 2021 crash, Ray suffered a moderate to severe traumatic brain injury with prolonged posttraumatic amnesia, causing frontal lobe syndrome with persistent behavioral changes, hypersexual behavior, and neurocognitive disorder.  See 8/8/22 Katz report, p. 8.  An MRI performed on February 13, 2021, during Ray's initial post-crash hospitalization, revealed bleeding in multiple areas of Ray's brain as well as "diffuse hemorrhagic axonal injury."  See 8/8/22 Katz report, p. 8.  Indeed, Ray's brain remains visibly injured in neuroimaging studies.  On December 12, 2023, another MRI of Ray's brain was performed.  The radiologist found "areas of chronic hemosiderin staining related to remote hemorrhage" as well as "right frontal gliosis." See 12/12/23 CNY Brain report, p. 1.  In other words, almost three years after the crash, Ray's brain remained visibly stained by bleeding, and he has a visible area of brain damage in his right frontal lobe.

As soon as Ray regained consciousness in the hospital, his doctors and nurses began documenting hypersexual behavior as one of Ray's many TBI symptoms.  During an in-hospital neurosurgery consult eight days after the crash, Ray was described as "intermittently oriented and hypersexual."  See 8/8/22 Katz report, p. 8. Ray's condition was described as follows:

Exposes genitals frequently, peeing in sink, saying inappropriate things and gestures for sexual activity.  Also describes hyperorality wanting to kiss or put object in mouth.  Mr. Ramos appears not to care about behavior.

See 8/8/22 Katz report, p. 8.  As to his own observations of Ray, the neurosurgeon found that Ray "[h]as an odd affect, constantly fidgeting with covers and pulling them up to face, handsy, hypersexual towards nurse practitioner."  See 8/8/22 Katz report, p. 8.  The neurosurgeon concluded that, due to his traumatic brain injury, Ray "has neuropsychiatric dysfunction resembling a frontal lobe syndrome and/or temporal lobe/Kluver-Bucy type syndrome."  See 8/8/22 Katz report, p. 8.

Frontal lobe syndrome is a condition caused by trauma to the brain's frontal lobe, resulting in dramatic changes in behavior and personality, impulsivity and a lack

of judgment, as well as impairment to planning, social behavior, motivation and language/speech production.  Kluver-Bucy syndrome is a rare neuropsychiatric disorder caused by brain lesions (often from trauma) characterized by hypersexuality, hyperorality, hypermetamorphosis (excessive attentiveness to visual stimuli with a tendency to touch every such stimulus regardless of its history or reward value), bulimia, placidity (flattened emotions), visual agnosia (impairment in recognizing visually-presented objects), and amnesia.  Ray also had severe problems with memory, comprehension, speech, stuttering, vision, gait, balance, tremors, anger outbursts, blackouts, hallucinations, and confabulations (reporting events that did not occur).  See 8/8/22 Katz report, pp. 2-5, 12-22.  ***Regarding Ray's need for care and supervision, Dr. Katz initially found that Ray would need an average of 36 hours of assistance per week for the rest of his life "as long as he has family support, supervision, and cueing." See 8/8/22 Katz report, p. 25.  Without significant assistance from his family, Dr. Katz found that "he will need assisted living."***  See 8/8/22 Katz report, p. 25. Dr. Katz also found that Ray would benefit from intensive in-patient rehabilitation.  See 8/8/22 Katz report, p. 24.

***Because Defendants ignored Ray's first-party claims for payment on the UM policies and deprived Ray of needed financial resources, there were delays in Ray's treatment.***  Hartford in its capacity as workers' compensation carrier denied coverage of additional inpatient treatment for Ray, and Hartford in its capacity as Ray's UM carrier ignored Plaintiff's settlement demands.  Ray obtained a loan to cover his treatment and was admitted to NRC/TASS Post-Acute Brain Injury Rehabilitation Program for inpatient treatment on April 18, 2023. See 8/14/23 Katz report, p. 1.

As shown in Dr. Katz's 8/14/23 report, issued around the time of Ray's discharge from TASS, Ray had made significant gains in his ability to function independently.  See 8/14/23 Katz report, p. 1.  For example, as a result of intensive physical and occupational therapy, Ray could now walk up stairs without assistance, and "[h]e was able to learn to cook with occasional visual cues for proper sequencing."  See 8/14/23 Katz report, p. 1.  However, even after the impressive gains Ray made through his treatment at TASS, Dr. Katz found that Ray continued to require "assistance and supervision on a daily basis."  See 8/14/23 Katz report, p. 6.  ***Ultimately, Dr. Katz concluded that Ray would require 22 hours per week of in-home attendant care plus significant help from family members, or he would need to live in an assisted living facility***.  See 8/14/23 Katz report, p. 6.

When Ray was discharged***, Ray had no ability to hire in-home attendants for 22 hours per week because Defendants have ignored Ray's first-party claims for payment on the UM policies.***  So Ray's family did the best they could.  His wife, Jacquie, was forced to leave him home unsupervised each week while she worked full-time to financially support them.  ***Unsupervised, Ray's condition deteriorated***. See 12/19/23 Katz report, pp. 1-4.  ***Ray exhibited hypersexual***

***symptoms while Jacquie was at work, and Ray was arrested on misdemeanor charges***. See 12/19/23 Katz report, pp. 2-4.  Dr. Katz explained:

Mr. Ramos has a history of hypersexual behavior due to his traumatic brain injury.  He is disinhibited due to his traumatic brain injury and neurocognitive disorder.  He has frontal lobe syndrome with persistent behavioral changes. . . . . In my opinion, to a reasonable degree of medical certainty, this bad decision and bad action is a consequence of his moderate to severe traumatic brain injury.

See 12/19/23 Katz report, pp. 2-4.

***As a result of these misdemeanor charges, Ray is subject to a stay-away order precluding him from living in his home*** with his wife and his minor stepdaughter.  It is unclear whether Ray will ever be able to share a home with his family again. Ray struggled to understand what had happened to him, and he became suicidal. See 12/19/23 Katz report, pp. 2-4.  As Dr. Katz wrote repeatedly in his report dated 12/19/2023:  "This is a dire situation."  See 12/19/23 Katz report, pp. 3-4.

Dr. Katz recommended that Ray be re-admitted for inpatient care at TASS, and Ray was admitted on January 8, 2024.  See 12/19/23 Katz report, p. 4.  Ray is currently at TASS, where he remains as an inpatient resident indefinitely.  Dr. Katz has now concluded that, due to the cognitive and behavioral symptoms caused by his brain injury, Ray should have caregivers available to him 24 hours a day for the rest of his life.  See 4/9/24 Katz report, pp. 3-4.

*Id.* at 61-66 (emphasis added).  Ramos fully disclosed the basis for his consequential-damages claim, including those related to in-home care.

Hartford also argues that Ramos "was obligated to provide a calculation of the damages that flowed from the breach so any penalties allowable under the Louisiana bad faith statutes could be calculated accordingly, and he has not done so."  Defs. Mem. [238] at 9.  Hartford did seek that in the second set of interrogatories, but Ramos points out that "[l]ife care planner Bruce Brawner provided valuations of the care recommended by Dr. Katz in the 2023 report and the 2024 report."  Pl.'s Mem. [252] at 8.  Brawner's report shows the costs differences for in-home care verses assisted living.  Brawner Cost Chart [251] at 18.

Ramos's CPA expert Chad Garland then calculated the increased expense of institutional care. Garland [265-3] at 17. He explains in his supplemental report that he received another life-care plan (LCP) "which reflected Dr. Howard Katz's original treatment recommendations for Mr. Ramos from August 2023. I then prepared a supplemental medical expense calculation on January 16, 2025, using this earlier LCP." Garland [251-3] at 17. He says the supplement "compares these two life care plans and calculates the difference." *Id.* at 16.

In sum, Ramos disclosed the factual basis for his claim that the delayed payments precluded in-home care and caused the need for assisted living. Ramos's experts (Brawner and Garland) then ran calculations comparing the increased costs of assisted living, arriving at figures just north of $7,000,000. *See id.* at 17; Brawner Cost Chart [251-5] at 18.

Plus, as Ramos also notes, he has a right to argue for general damages caused by the alleged breach of the duty of good faith and fair dealing, such as mental anguish he claims because the payments were delayed. Pl.'s Mem. [252] at 4, 10. *See Wegener v. Lafayette Ins. Co.*, 60 So. 3d 1220, 1230 (La. 2011) (holding mental-anguish damages available as consequential damages under precursor of section 22:1973).

Hartford's final argument is that Ramos failed to prove these losses, suggesting that expert testimony is required to prove the extra expenses were caused by Hartford's delay. Ramos responds by citing expert opinions from Dr. Katz about causation, like his opinion that Ramos needed in-home care that he did not receive and that he then needed assisted living. Pl.'s Mem. [252] at 8 (citing Katz Decl. [251-4] at 50). He also addresses the cause of and implications flowing from Ramos's arrest—including the resulting inability to receive in-home care. Pl.'s Mem. [252] at 8 (citing Katz Decl. [251-4] at 50). In any event, "a motion in limine cannot be a substitute for a motion for summary judgment, a motion to dismiss, or a motion for

directed verdict." *Jackson-Hall*, 2012 WL 1098524, at *6.  Hartford knew Ramos was seeking

these damages and could have sought partial summary judgment.

Hartford's motion [237] is therefore denied as to section 22:1973 damages.  But the

Court will reserve final ruling for trial.  If Hartford wishes to raise this issue again, it must first

do so outside the jury's presence.

**Motion [262].**  Hartford's second motion regarding in-home care [262] fails for the same

reasons, but it's also untimely.

There is no dispute Hartford filed this motion after all relevant deadlines, but it claims

good cause because it believes this paragraph from Ramos's proposed draft pretrial order

mentioned new claims:

> Hartford's failure to timely pay Ray's UM claim violated La. Rev. Stat.
> § 22:1892(A)(1), La. Rev. Stat. § 22:1973, and *McDill*.  Ray's treating physician
> has explained that, more likely than not, if Ray had appropriate supervision from
> in-home care attendants as Dr. Katz had recommended at the time of Ray's
> August 2023 discharge, Ray would still be able to live with his family at home.
> Based on the cost projections made by Brawner, Garland has calculated that the
> inability to keep Ray in the home has increased the cost of his future medical care
> by more than $7,000,000.  Hartford's failure to timely pay Ray's claim was
> arbitrary and capricious, and Hartford owes Ray compensatory and general
> damages, statutory penalties, attorneys' fees, interest and costs.

Defs.' Mot. [262] at 1.

According to Hartford, "Plaintiff never disclosed the aforementioned allegations of fact

and expert opinion in discovery."  *Id.*  And it argues in reply that this was "in fact, the first time

that Plaintiff made any claim that Hartford failed to provide 'appropriate supervision from in-

home health care attendants' and that failure allegedly resulted in increased medical costs in the

amount of $7,000,000."  Defs.' Reply [273] at 1.

The Court won't rehash everything quoted in the previous section, but this was not the

first time Ramos offered his in-home assistance theory or the $7 million figure.  Ramos's

9

discovery responses quoted in the preceding section largely track what Ramos inserted in the draft pretrial order. And those discovery responses revealed Ramos's claims related to "in-home care attendants to supervise his activities." Pl.'s Int. Resp. [237-1] at 61; *see also* Pl.'s Mem. [252] (outlining how Ramos disclosed this claim); Pl.'s Mem. [266] (outlining why Defendants' motion is untimely).

In sum, the deadlines for dispositive motions, *Daubert* motions, and motions in limine all passed before Hartford filed this motion. It must therefore demonstrate good cause under Federal Rule of Civil Procedure 16(b)(4). Hartford has not made that showing under the applicable test. *See E.E.O.C. v. Serv. Temps Inc.*, 679 F.3d 323, 334 (5th Cir. 2012). Hartford has not offered a valid reason for the delay; the importance of the motion is minimal because this motion overlaps Motion [237]; prejudice is neutral for the same reason; and it is too late for a continuance. In sum, the motion is denied as untimely but would alternatively be denied for the same reasons as Motion [237].[1]

B.    Plaintiff's Motion to Exclude Regarding Workers' Compensation [240].

Ramos moved to exclude evidence about two workers'-compensation issues in Motion [240], both of which the Court took under advisement: (1) whether Ramos failed to submit expenses to workers' compensation and (2) whether he was required to appeal the denial of

---

[1] Just for future reference, the motion is also procedurally defective. As Plaintiff notes, Uniform Local Rule 7(b)(4) requires a separately filed memorandum except in circumstances that don't apply here. Hartford says though that no such memorandum was necessary—"as Local Rule 7(b)(2)(B) provides, as this motion was less than four pages, a separate memorandum was not required." Defs.' Reply [273] at 2. Rule 7(b)(2)(B) says no such thing. It merely provides that "a *motion* may not exceed four pages" and "may not contain legal argument or citation to case law or other secondary authority." L.U. CIV. R. 7(b)(2)(B) (emphasis added). This dovetails with the requirement for a separate memorandum, the proper place for legal arguments and authority. Indeed, Hartford offered a 10-page memorandum in rebuttal. There is simply no way to read that rule as negating the requirement for a memorandum under Rule 7(b)(4).

medical expenses. Pl.'s Mem. [241] at 13–15. The Court grants this motion but defers final ruling until trial.

Hartford doesn't seem to address the first part of the motion directly—that is, whether Ramos failed to submit certain expenses to workers' compensation. That part is granted. It does, however, argue that as the UM and workers'-compensation carrier, it is entitled to a credit for amounts its workers'-compensation arm paid, thus making workers' compensation relevant. It also argues in response to Motion [242], that there might be statements in the workers'-compensation claim history relevant to this case. *See* Defs.' Resp. [256] at 4–5. These points may be well-taken, but it's unclear that Ramos's motion would preclude these categories. The motion is limited, seeking to exclude only evidence and argument suggesting that he failed to submit expenses to workers' compensation or that he failed to mitigate by failing to appeal. Mot. [240] at 2. His memorandum is also limited. Accordingly, this Order addresses what Ramos sought and is not a blanket prohibition against any reference to workers' compensation.[2]

Otherwise, Hartford focuses on Ramos's failure to appeal the denial of a workers'-compensation claim for in-home care, calling it a failure to mitigate. It says this "could have resulted in faster treatment and relief." Defs.' Mem. [257] at 11. Here too, the Court wants to hear more from the parties. Specifically, Ramos says there was no duty to appeal because the Hartford entities were solidary obligors as to the denied medical treatment—the claim Hartford

---

[2] There may, however, be an issue to resolve at trial. Hartford's primary authority for a credit does hold that a UM carrier is "entitled to a credit for all compensation benefits, in the form of medical expenses and lost wages, received by the plaintiff from his employer and/or its workers' compensation insurer." *Bellard v. Am. Cent. Ins. Co.*, 980 So. 2d 654, 671 (La. 4/18/08). But that case did not address the statutory penalties in dispute here. So it remains unclear whether a credit applies in this context, and, if so, how it would be proven. The Court will need to hear more.

said Ramos should have appealed.  Pl.'s Mem. [241] at 15.  Hartford agrees that it and the workers'-compensation carrier (another Hartford entity) were solidary obligors, but it says Ramos had a general duty to mitigate from the solidary obligor.  Defs.' Mem. [257] at 10.  It doesn't explore why that's so.

The Courts own research suggests that an insured's duty to mitigate isn't wiped out by his insurer's breach of its duty to pay his claim.  *Real Asset Mgmt., Inc. v. Lloyd's of London*, 61 F.3d 1223, 1230 (5th Cir. 1995).  Thus, a bad-faith award under section 22:1973 should be reduced to account for failure to mitigate.  *Id*. at 1232 (discussing precursor statute section 22:1220).  But at least one court has held that "[t]he law of mitigation of damages does not require that an obligee pursue recovery from one particular solidary obligor in preference to another."  *Ciolino v. First Guar. Bank*, 133 So. 3d 686, 698 (La. Ct. App. 2013) (citing art. 1795).  Absent contrary authority from Hartford, the *Ciolino* holding supports Ramos's motion.

While it appears that Ramos had no duty to appeal, the Court would prefer to hear authority from the parties.  There also exists a potential risk of serious prejudice that would justify an in limine ruling.[3]  Accordingly, the motion will be granted though final determination will be reserved until the Court hears more.

    C.    Plaintiff's Motion to Exclude Regarding Medical Testimony, Medical Causation and Damages [242].

Like others, this motion comes with subparts.

---

[3] There frankly seems to be a risk of prejudice for both parties.  Hartford's mitigation argument is that had Ramos appealed, it "could have resulted in faster treatment and relief."  Defs.' Mem. [257] at 11.  That could suggest that Hartford's workers'-compensation arm wrongfully denied the workers'-compensation claim, which could lead to prejudice and confusion.

1.    Reasonableness of Ramos's Past and Future Medical Care and Costs.

Citing Rule 403, Ramos asks the Court to exclude challenges to the reasonableness, propriety, and necessity of his past medical treatment and expected future medical care, saying such evidence would be more prejudicial or confusing than probative.  Pl.'s Mem. [243] at 1.  He bases that on Louisiana law: "[a]bsent bad faith, 'it is error for the trier of fact to fail to award the full amount of medical expenses that are proven by a preponderance of the evidence that were incurred as a result of an accident.'"  *McCloskey v. Higman Barge Lines, Inc.*, 269 So. 3d 1173, 1178 (La. Ct. App. 2019) (quoting *Watson v. Hicks*, 172 So. 3d 655, 675 (La. Ct. App. 2015)).  Hartford addresses none of Ramos's cited authority but says he is attempting to switch the burden of proof to Hartford.  This part of the motion is mostly denied.

To begin, the parties make their arguments generally as to all medical bills without separately explaining the differences among them.  For example, Ramos incurred substantial medical bills for which Hartford tendered its limits.  To the extent that this motion focuses on consequential damages, they could be for past or future medical expenses, and the legal frameworks are different.

***Past medical expenses:***  A plaintiff pursuing claims under Louisiana law carries an initial burden to "prove that their injuries and associated treatments were the result of the accident at issue in order to collect past medical expenses."  *Id.*  If that burden is met, "[t]he tortfeasor is required to indemnify the cost of overtreatment or unnecessary medical treatment unless the overtreatment was incurred in bad faith."  *Yee v. Imperial Fire & Cas. Ins. Co.*, 25 So. 3d 872, 877 (La. Ct. App. 2009) (citing *Green v. Nunley*, 963 So. 2d 486 (La. Ct. App. 2007)).

Based on that, Ramos says "[i]n the absence of bad faith, Louisiana courts do not allow testimony or evidence as to the reasonableness and necessity of a plaintiff's medical bills."  Pl.'s

Mem. [243] at 2–3 (citing *Antippas v. Nola Hotel Grp., LLC*, 265 So. 3d 1212, 1218 (La. Ct. App. 2019)).  But *Antippas* doesn't say that.  Like other Louisiana cases, the court merely noted the duty to pay past medical bills absent bad faith and stated that there were no "allegations or evidence introduced at trial of bad faith."  265 So. 3d at 1221.  Other cases have also held that damages should not be reduced when there was "no allegations or evidence introduced at trial of bad faith."  *Revel v. Snow*, 664 So. 2d 655, 661 (La. Ct. App. 1995), *writ denied*, 666 So. 2d 108 (La. 1996).  These cases do not exclude evidence about reasonableness and instead assume defendants may try to make that showing.  Nor do they suggest that a defendant can't cross-examine the plaintiff's physician in hopes of establishing bad faith.

Ramos does, however, cite two United States District Court cases that limited expert testimony.  These cases involved the same expert, but the results were a little different.  In *Rodrigue v. National Insurance Co.*, the plaintiff moved to exclude testimony from a medical-billing expert.  No. CV 20-2267, 2021 WL 3284254, at *1 (E.D. La. July 2, 2021).  There, the defendants did not "object to the treatment received but to the cost of that treatment."  *Id.* at *3. Because the defendant did not assert bad faith, the court precluded the testimony, explaining "Louisiana law is clear that '[e]ven if a tort victim has been overcharged for medical treatment, the tortfeasor is liable for the expenses unless they were incurred by the victim in bad faith.'"  *Id.* at * 4 (quoting *Lair v. Carriker*, 574 So. 2d 551, 553 (La. Ct. App. 1991)).

The court in *Collins v. Benton* faced the same question about the same expert and likewise concluded that the expert could not be "used to attack the reasonableness of Plaintiffs' medical bills—unless Defendants present evidence that Plaintiffs incurred medical expenses in

bad faith." 470 F. Supp. 3d 596, 605 (E.D. La. 2020). Ramos quotes this holding but not the

next:

> Plaintiffs' treating physicians may have a substantial financial incentive to
> provide a favorable medical causation analysis. A jury could find that by
> overcharging Plaintiffs, the treating physicians will undoubtedly receive a
> windfall. Indeed, even if Plaintiffs' treating physicians offered Medport a
> substantial discount on the medical bills, the treating physicians' financial
> recovery may still exceed Michalski's estimate for the reasonable value of such
> services. That financial arrangement could be extremely lucrative to the treating
> physicians.
>
> Accordingly, because Michalski's testimony is relevant to impeach the
> credibility of Plaintiffs' treating physicians, her testimony may assist the trier of
> fact with an issue at trial and is admissible. Unless evidence that Plaintiffs
> incurred medical expenses in bad faith is presented at trial, the Court will instruct
> the jury that Michalski's testimony cannot be used to decrease Plaintiffs'
> recoverable medical expenses.

*Id.* at 606 (citing *Thomas v. Chambers*, No. CIV 18-4373, 2019 WL 8888169, at *14 (E.D. La.

April 26, 2019)) (quotation marks omitted).

During the pretrial conference, Hartford stated that it had no intention of nitpicking the

cost of treatment—the kind of testimony excluded in *Rodrigue*. The motion is granted to that

extent. If Hartford changes its mind, it must raise the issue away from the jury. But Hartford

does intend to cross-examine Dr. Katz regarding his financial incentives and the reasonableness

of some of the treatment. Hartford may do both. It may try to show bad faith and attempt to

impeach. If appropriate, the Court will properly instruct the jury regarding the limited purpose

of this evidence.

**Future medical expenses:** Future medical expenses are different than past medical

expenses. Future medical expenses "must be established with some degree of certainty, and

awards will not be made in the absence of medical testimony as to the requirement for such

expenses and their probable cost." *James v. Webb,* 643 So. 2d 424, 429 (La. Ct. App. 1994), *writ*

*denied,* 648 So. 2d 396 (La. 1994). Ramos has not yet shown that Hartford must be precluded in limine from questioning whether the future medical expenses are reasonable. The Court denies this part of the motion too.

> 2. Medical Opinions not Made by Physician or Other Health-Care Provider

Ramos says it would violate Federal Rule of Evidence 702 to allow any witness other than a medical expert to opine on medical issues. Some of this may be addressed in orders addressing *Daubert* motions. For now, the Court holds that medical opinions must come from admitted medical experts. The motion is therefore granted to the extent that it precludes expert medical opinions from witnesses that are not admitted as medical experts.

That said, this request is too broad in the context of a bad-faith case like this because it would preclude other witnesses from discussing medical issues. Neither case Ramos cites involved medical testimony, much less in the context of a bad-faith claim. Yet the issue presented here is whether Hartford's adjustors failed to make a timely tender based on the medical records and other information Ramos provided. Testimony from those adjustors (or about them) would necessarily touch on conclusions they drew, or should have drawn, some of which might sound like medical opinions. Though these witnesses may not present expert medical opinions, they can offer testimony on medical issues as they relate to adjusting the claim (and perhaps other issues). Indeed, the Court fully expects Ramos to cross-examine those witnesses on the conclusions they reached about his condition.

Finally, this topic is not so prejudicial that it could not be handled with a contemporaneous objection and a limiting instruction if Ramos thinks an unqualified witness is offering medical testimony.

### 3.    Nurses Opinions on Workers' Compensation Coverage

Ramos moves to exclude a nurse he thinks Hartford might call as a witness.  Pl.'s Mem. [243] at 5–6.  Hartford denied that assertion, so the motion is granted to that extent.  The remaining workers'-compensation issues are addressed above.

### 4.    Evidence of Malingering or Exaggeration

Next, Ramos wants to exclude evidence that he "is malingering and/or exaggerating his symptoms for secondary gain," saying that "malingering" is a medical diagnosis for which Hartford lacks a designated expert.  Pl.'s Mem. [243] at 7.  Hartford disclaims any intent to offer expert opinions on the subject but asserts its right to cross-examine Ramos on "his claims related to his past and present medical conditions."  Defs.' Resp. [256] at 6.

While malingering may have a medical definition, it also has a colloquial one that would not require expert testimony.  Nor is this so unfairly prejudicial that the issue could not be handled with a timely objection.  Ramos may request a limiting instruction, but Hartford is allowed to cross-examine Ramos regarding his injuries and consequential damages.  Ramos's motion is denied on this topic without prejudice to specific objections he can support at trial.

### 5.    Evidence of Collateral Sources (HMR Servicing, LLC).

After the workers'-compensation carrier denied medical treatment Ramos sought, he contracted with HMR Servicing, LLC, to pay those costs, including inpatient rehabilitation.  Ramos appeared to reference this arrangement in discovery when explaining how Hartford's alleged delay caused consequential damages.  He now claims HMR was a collateral source and moves to exclude any reference to HMR or any other collateral sources.

Under Louisiana law, "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources

17

independent of the tortfeasor's procuration or contribution." *Bozeman v. State*, 879 So. 2d 692, 698 (La. 2004). The classic example is health insurance: if a plaintiff's insurer paid her medical bills, the defendant who injured her isn't entitled to reduce what he owes accordingly. *Id.*

Ramos argues that such evidence is statutorily precluded under Louisiana Revised Statute 9:2800.27(f):

> The jury shall be informed only of the amount billed by a medical provider for medical treatment. Whether any person, health insurance issuer, or Medicare has paid or has agreed to pay, in whole or in part, any of a claimant's medical expenses, shall not be disclosed to the jury.

Hartford does not address this section, but it does oppose the motion. It first argues that the motion is overly broad because the disputed insurance policies are themselves collateral sources. Defs.' Resp. [256] at 7. The Court does not read Ramos's motion to suggest that the jury cannot hear about the very policies in dispute. Other than that, Hartford focuses its opposition on HMR, so the motion is granted as to other collateral sources. If Hartford wants to use evidence of other collateral sources, it must first raise the issue outside the jury's presence.

As for HMR, the Court is not entirely convinced that it is a traditional collateral source. Even if it is, Ramos has not yet shown that the jury must be precluded from hearing evidence about HMR, provided the proof is not offered in a way that violates the collateral-source rule. While Louisiana did adopt section 9:2800.27(f) just before this accident, it has not repealed Louisiana Code of Evidence Article 409:

> In a civil case, evidence of furnishing or offering or promising to pay expenses or losses occasioned by an injury to person or damage to property is not admissible to prove liability for the injury or damage *nor is it admissible to mitigate, reduce, or avoid liability therefor. This Article does not require the exclusion of such evidence when it is offered solely for another purpose*, such as to enforce a contract for payment.

(Emphasis added).  Of course, the Federal Rules of Evidence apply in diversity cases, but the fact that Louisiana's Code still includes this rule of evidence suggests that it should be read in harmony with section 9:2800.27(f).

Before section 9:2800.27(f), courts applying Louisiana law routinely held that evidence of collateral sources is admissible for impeachment and other purposes.  One court even applied that rule to HMR.  In *Dantzler v. Delacerda*, the trial court excluded evidence of a financial arrangement between HMR and the plaintiff's healthcare provider.  No. 2020 CW 1108, 2020 WL 7869443 (La. Ct. App. Dec. 30, 2020).  The appellate court reversed, noting Rule 409 and holding that "evidence of the financial arrangement between HMR and the plaintiff's health care providers is admissible . . . for the purpose of impeaching the credibility of the plaintiff's treating physicians."  *Id.*; *see also Dumas v. Harry*, 638 So. 2d 283, 286 (La. Ct. App. 1994) (holding that "if the evidence is produced to impeach the credibility of plaintiff, the collateral source rule does not apply"); *accord Turcich v. Baker*, 594 So. 2d 505, 508 (La. Ct. App. 1992).

*Dantzler* cited a federal district-court opinion from Louisiana that reached the same conclusion under the Federal Rules of Evidence.   In *Thomas v. Chambers*, the plaintiff had a funding agreement like Ramos's, and the defendant—like Hartford— argued that the evidence was "admissible to impeach the credibility of plaintiffs' treating physicians who testify at trial, and to show that plaintiffs' medical bills are unreasonable."  2019 WL 8888169, at *4.  The court agreed, rejecting a collateral-source argument and finding the evidence admissible for "impeaching the credibility of plaintiffs' treating physician."  *Id.*

19

In sum, Louisiana substantive law applies, but evidentiary issues fall under the Federal Rules of Evidence. Thus, while Louisiana's collateral-source rule governs Ramos's available damages, the Federal Rules of Evidence govern the admissibility of evidence. Ramos has not shown otherwise. Even if Louisiana law does apply to this evidentiary issue, Louisiana Code of Evidence Article 409 permits this evidence if offered in the way Hartford suggests. Indeed, a Louisiana appellate court applied it to HMR. Ramos has not shown that Rule 409 has been negated. Nor is the evidence so unfairly prejudicial that it should be excluded under Federal Rule of Evidence 403.

Accordingly, the Court grants this motion only to the extent that Hartford may not offer evidence of collateral sources other than HMR. As to HMR, a limiting instruction would be appropriate and will be given at Ramos's request.

### 6.    Criticism of Dr. Katz

Lastly, Ramos seeks an order precluding argument or evidence that Dr. Katz was not a treating physician or that he was motivated by financial gain. Pl.'s Mem. [243] at 12. Ramos seems to focus on testimony from other witnesses questioning Dr. Katz's credibility. *Id.* at 14. Despite that focus, Hartford responds that "[a]s Defendants have an absolute right to cross-examine Dr. Katz as set forth in Rule 611, and bias is always relevant, Plaintiff's motion in limine is due to be denied." Defs.' Resp. [256] at 11.

If that's how Hartford plans to proceed, then it has that right. Like any witness, Dr. Katz's credibility is for the jury to decide and is fair game. If Hartford offers other witnesses to address Dr. Katz's motives, it can be addressed with a timely objection.

III.    Conclusion

The Court has considered all arguments; those not addressed would not have changed the outcome.  As described above, Hartford's Motion [237] is granted in part, and its Motion [262] is denied.  Plaintiff's motion [240]—as it relates to workers' compensation—is granted, though final determination will be reserved until the Court hears more.  Plaintiff's motion [242] is granted in part and denied in part.

**SO ORDERED AND ADJUDGED** this the 2nd day of July, 2025.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE